FILED
2026 Oct-01 PM 01:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **VANESSA KNIGHT-BELL,** | |
| **Plaintiff**, | |
| **v.** | **Case No. 5:26-cv-670-HDM** |
| **ASSURANT, INC.,** ***et al.*****,** | |
| **Defendants**. | |

## MEMORANDUM OPINION AND ORDER

Before the court is the motion to dismiss filed by Defendants Assurant, Inc. and American Bankers Insurance Company of Florida (together, "Defendants" or "Assurant") under Federal Rule of Civil Procedure 12(b)(6). (Doc. 10). The motion is fully briefed. (Docs. 15; 18). For the reasons below, the motion is due to be **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

The following facts are drawn from the complaint, (doc. 1), the exhibits attached to it, (docs. 1-1; 1-2), and the Equal Employment Opportunity Commission (EEOC) position statement that the complaint incorporates by reference, (doc. 10-2). They are accepted as true for purposes of the motion.[1]

[1] Assurant's position statement is only accepted as true in part. *See supra* pages 8–10.

## I. The EEOC Charge

Plaintiff Vanessa Knight-Bell is an African-American woman over the age of forty who resides in this District. (Doc. 1 at 4, ¶ 12). On February 4, 2024, acting through counsel, she filed a charge of discrimination with the EEOC naming Workday, Inc. and "Assurant" as respondents and checking the boxes for race, age, and "continuing action." (Doc. 1-1).[2] The charge alleges that "[w]ithin the last 180-days, Ms. Knight-Bell applied for a Customer Experience Analyst position with Assurant" and "was informed that her application was rejected via email" from an "assurant@myworkday.com" address. *Id.* at 1, ¶ 2. It alleges that "Assurant uses Workday, Inc., a third-party vendor, to screen, recruit, and acquire talent," and that, "[u]pon information and belief," Plaintiff's application "was screened by artificial intelligence processes and/or applications" that "evaluated [her] application for Assurant and decided whether she was to move forward in the hiring process." *Id.* at 1, ¶¶ 3–4.

The charge further alleges that "[t]he recruiting, procurement, selection processes and/or tests utilized by Workday, Inc. in making selection decisions" discriminate on the basis of race, *id.* at 2, ¶ 15; that "[b]y funneling all applicants through Workday's software, Assurant has designated Workday and their AI to be

---

[2] The charge is signed and dated February 3, 2024; the form and its fax header also reflect a date of February 4, 2024. (Doc. 1-1 at 1). Nothing turns on the difference.

the exclusive agent for employment opportunities," *id.* at 3, ¶ 20; that "Workday's AI screening mechanism functions as an employment test/screening tool for applicants to advance in Assurant's referral and selection process," *id.* at 3, ¶ 21; that the tool "has not been validated in accordance with the Uniform Guidelines on Employment Selection Procedures," *id.* at 3, ¶ 22; and that "the selection tools and/or tests utilized by Assurant and Workday, Inc. in making selection decisions" both intentionally discriminate and have a disparate impact on the basis of age, *id.* at 4, ¶ 29. It alleges intentional and disparate-impact race discrimination against Plaintiff "and other African-Americans," and that Plaintiff's age was "a but for factor in her denial of employment as her resume reflects over 30 years of work history." *Id.* at 4, ¶¶ 19, 26, 28. The charge identifies no job application other than the one for the Customer Experience Analyst position.

## II. Assurant's Position Statement

Assurant responded to the charge in a position statement dated April 23, 2024. (Doc. 10-2). It explained that Assurant, Inc. is a holding company with no employees and that the entity to which Plaintiff applied is American Bankers Insurance Company of Florida. *Id.* at 1 n.1. Assurant denied using any artificial intelligence or machine learning in its hiring process. *Id.* at 2, 4. It stated that "[t]o scale its talent acquisition and hiring processes, Assurant employs a talent management software created by Workday, Inc.," which "enables employers to maintain their own

employment applications, supply information to potential candidates regarding the application process, create and conduct surveys or questionnaires to solicit information from candidates, and apply their own assessment criteria to evaluate the suitability of their applicants for a particular job." *Id.* at 3. As to the Customer Experience Analyst position, Assurant stated that it "received hundreds of applications," that "[d]ue to the overwhelming number of applications, Assurant's Talent Acquisition Manager . . . first identified candidates to move forward by searching and reviewing candidates' applications and resumes for certain key skills/terms," and that "[t]hereafter, further manual processing of applications occurred and Assurant hired a candidate for the position." *Id.* at 4. Assurant contended that Plaintiff lacked the necessary skills and experience, that it did not know her race or age when it declined her application, and that the successful candidate "identifies as being of 'two or more' race, and is over the age of 40." *Id.* The position statement describes itself as "a summary only" that "does not constitute an affidavit or binding statement of Assurant's legal position, nor is it intended to be used as evidence of any kind." *Id.* at 1–2 & n.2.

The EEOC closed its investigation and issued a notice of right to sue on January 22, 2026. (Doc. 1-2 at 1).

### III. The Complaint

Plaintiff filed this action on April 22, 2026. (Doc. 1). The complaint does not mention Workday, and it no longer attributes Plaintiff's rejection to artificial intelligence or machine learning. Relying instead on what it characterizes as Defendants' "admissions" in the position statement, it alleges that Assurant uses "a centralized, keyword-driven applicant-tracking system ('ATS')" as the gateway that determines which applications receive human review. *Id.* at 2, ¶¶ 4–6. According to the complaint, Assurant's Talent Acquisition Manager "first identified candidates to move forward by searching and reviewing candidates' applications and resumes for certain key skills/terms," and only "thereafter" did "further manual processing of applications" occur, *id.* at 6, ¶¶ 22–23 (quoting Assurant's position statement); "[c]andidates eliminated by the keyword screen are never seen by any human evaluator," *id.* at 7, ¶ 23. The complaint alleges that "[t]he specific employment practice at issue is Defendants' use of keyword-based resume screening—executed through the talent management platform—as the gateway determination of which applicants advance." *Id.* at 14, ¶ 53.

Plaintiff alleges that between approximately 180 days before February 4, 2024, and April 3, 2024, she submitted twenty-one applications to Defendants, all of which now show a status of "Inactive" in Defendants' applicant portal. *Id.* at 1, ¶ 3; *id.* at 12, ¶ 46. She alleges that she holds a bachelor's degree in commerce and

business administration with a minor in computing technology, that she has professional experience in "healthcare information systems, data processing, and administrative operations," and that her "qualifications were, by any objective measure, sufficient to advance beyond initial screening" for each position. *Id.* at 4–5, ¶¶ 12, 16–18. The complaint identifies two of the twenty-one positions by title: the Customer Experience Analyst position, and a Product Compliance Analyst position for which Defendants' system sent Plaintiff a phone-interview invitation on April 3, 2024, and then retracted it the same day with the explanation that "our system sent you a phone interview request in error." *Id.* at 6, ¶ 22; *id.* at 12–13, ¶ 47. The complaint does not identify the remaining nineteen positions, the dates on which Plaintiff applied for them, or their requirements.

Drawing on academic literature concerning algorithmic hiring tools, the complaint alleges several mechanisms by which keyword-based screening can produce disparate outcomes: keyword criteria may correlate more strongly with the prior employment and educational experiences of white or younger applicants; keywords that emphasize job titles, employer names, or credentials "can function as proxies for race or age"; résumé terminology evolves over a career, so criteria "calibrated to current or younger-workforce terminology will systematically undervalue" older applicants' experience; and employment dates on a résumé "permit age inference." *Id.* at 9–11, ¶¶ 34–42. The complaint alleges, "[u]pon

information and belief," that Defendants "performed no validation study of their keyword criteria." *Id.* at 10, ¶ 37. It alleges that the pattern of Plaintiff's rejections "is consistent with and probative of screening criteria that systematically disadvantage African-American applicants and applicants over the age of forty." *Id.* at 13, ¶ 48. And it alleges that "Defendants' assertion that they lacked knowledge of Plaintiff's race and age at the time of screening is therefore legally irrelevant to the disparate impact analysis." *Id.* at 12, ¶ 45.

The complaint asserts three counts: disparate-impact race discrimination under Title VII (Count I); disparate-treatment race discrimination under Title VII (Count II); and "Age Discrimination in Hiring" under the ADEA (Count III). *Id.* at 14–18, ¶¶ 51–74. Count III alleges both that Plaintiff's "age was the but-for cause of Defendants' adverse employment decisions" and that Defendants "operate a screening system that produces disparate age-based outcomes." *Id.* at 17–18, ¶¶ 68, 73.

Defendants move to dismiss on four grounds: (1) Plaintiff failed to exhaust administrative remedies as to the keyword-screening theory; (2) Plaintiff failed to exhaust any claim concerning a position other than the Customer Experience Analyst position; (3) the complaint does not plausibly allege intentional discrimination; and (4) the complaint does not plausibly allege disparate impact. (Doc. 10 at 1–2).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court accepts well-pleaded factual allegations as true and construes them in the light most favorable to the plaintiff, but it does not accept legal conclusions couched as factual allegations. *Id.*; *Twombly*, 550 U.S. at 555–56. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. And "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Id.* at 679.

In ruling on the motion, the court considers the EEOC charge and the notice of right to sue, which are attached to the complaint and are therefore part of the pleading for all purposes. Fed. R. Civ. P. 10(c); (Docs. 1-1; 1-2).[3] The court also considers Assurant's position statement, which Defendants attached to their motion.

[3] Defendants state that Plaintiff "did not attach her Charge of Discrimination or any other exhibits to her Complaint." (Doc. 10 at 3 n.3). That is wrong. The charge is Doc. 1-1, and Defendants' Exhibit 1, (doc. 10-1), duplicates it.

(Doc. 10-2). A document outside the pleadings may be considered on a Rule 12(b)(6) motion, without converting the motion into one for summary judgment, if the document is central to the plaintiff's claims and its authenticity is undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *see also Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). The complaint quotes the position statement repeatedly and builds its description of the challenged practice on Assurant's "admissions" in it, (*see, e.g.*, Doc. 1 at 2, ¶¶ 4–5; *id.* at 6–7, ¶¶ 19–23; *id.* at 13, ¶ 49), and Plaintiff does not dispute the document's authenticity. Plaintiff cannot rely on the position statement's description of Assurant's screening process while asking the court to disregard the remainder of the document. (*See* Doc. 15 at 5).

Incorporation by reference, however, permits the court to consider what the position statement says; it does not permit the court to accept the truth of the contested factual assertions Assurant made in it as against the pleader. Defendants ask the court to credit Assurant's statements that no automation was involved in the screening and that the successful candidate was non-white and over forty, and they assert that the position statement "would refute" any comparator allegation Plaintiff might make. (Doc. 10 at 16; *see id.* at 4, 14, 18). Those are positions Assurant advanced in an adversarial submission that, by its own terms, is not "intended to be used as evidence of any kind." (Doc. 10-2 at 3 n.2). At this stage the court accepts

the well-pleaded allegations of the complaint, not the employer's contrary account, and it draws no inference against Plaintiff from the position statement or from the exhibits attached to it.[4]

## DISCUSSION

### I. Administrative Exhaustion

Before suing under Title VII or the ADEA, a plaintiff must file a timely charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1); *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004). The charge-filing requirement is not jurisdictional, but it is a mandatory claim-processing rule that the court must enforce when, as here, the defendant timely invokes it. *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 551 (2019). Because the charge is attached to the complaint, the defense may be resolved on the pleadings.

A "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory*, 355 F.3d at 1280 (citation modified). Judicial claims are permitted if they "amplify, clarify, or more clearly focus" the allegations in the charge, but "allegations of new acts of discrimination are inappropriate." *Id.* at

[4] Defendants also assert that Plaintiff is a party to litigation pending against Workday in the Northern District of California. (Doc. 10 at 4 n.4). That assertion is outside the pleadings and plays no role in the court's analysis.

1279–80 (quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)). The "proper inquiry" is whether the complaint is "like or related to, or grew out of, the allegations contained in [the] EEOC charge." *Batson v. Salvation Army*, 897 F.3d 1320, 1328 (11th Cir. 2018) (quoting *Gregory*, 355 F.3d at 1280). Courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]," and "the scope of an EEOC complaint should not be strictly interpreted." *Gregory*, 355 F.3d at 1280 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460–61, 465 (5th Cir. 1970)). "The facts alleged in the charge matter most for determining what can reasonably be expected to grow out of an EEOC charge; the legal theory the charging party articulates is far less important." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022).

**A. The keyword-screening theory**

Defendants contend that the complaint's keyword-screening theory is unexhausted because the charge attributed Plaintiff's rejection to Workday's artificial intelligence and "does not make a single reference to 'keyword.'" (Doc. 18 at 2). The court disagrees.

The exhaustion inquiry turns on facts, not vocabulary. *Patterson*, 38 F.4th at 1345. Every operative fact is the same in the charge and the complaint: the same charging party, the same protected characteristics, the same respondent, the same position, the same adverse action (non-advancement past the initial screen), the same

legal theories (disparate treatment and disparate impact under Title VII and the ADEA), and the same challenged practice—the process by which Assurant, using its Workday platform, dispositioned applications for the Customer Experience Analyst position before any individualized review. The charge described that process, expressly "[u]pon information and belief," as artificial intelligence. (Doc. 1-1 at 2, ¶¶ 3–4). The complaint, informed by Assurant's own account, describes it as a keyword search configured by Assurant and executed through the same platform. (Doc. 1 at 6–7, ¶¶ 22–23). That is a refinement of *how* the charged screen operated, not an allegation of a new act of discrimination. *See Gregory*, 355 F.3d at 1279–80.

Two features of the charge confirm the point. First, the charge did not confine itself to artificial intelligence. It challenged Assurant's "recruiting, procurement, selection processes and/or tests," alleged that Assurant "funnel[ed] all applicants through Workday's software," described the tool as "an employment test/screening tool for applicants to advance in Assurant's referral and selection process," and alleged that the tool had "not been validated in accordance with the Uniform Guidelines." (Doc. 1-1 at 2–3, ¶¶ 15, 20–22). An investigator reading those allegations would reasonably ask what the screen was and how it worked. Second, that is exactly what happened: Assurant's response to the charge disclosed the keyword search to the EEOC. (Doc. 10-2 at 4). Defendants are correct that

exhaustion is measured by the charge rather than by what a plaintiff later learns from a position statement. (Doc. 18 at 4). But the governing test asks what investigation "can reasonably be expected to grow out of the charge," *Gregory*, 355 F.3d at 1280, and the investigation that grew out of this charge encompassed the practice Plaintiff now pleads. A charging party who identified the employer's gatekeeping screen, misdescribed its internal mechanics, and then pleaded the employer's own corrected account has not asserted a new act of discrimination. *See Wu*, 863 F.2d at 1547.

Defendants' authorities involve genuinely new adverse actions: a termination that occurred after the charge was filed, *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 893 (11th Cir. 2014), and a denial of incentive pay and a failure to promote that were never presented to the agency, *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 991 (11th Cir. 2025). None involve a plaintiff who challenged the correct employment decision and the correct practice but misapprehended how the practice operated. The motion is due to be **DENIED** insofar as it seeks dismissal of the keyword-screening theory as applied to the Customer Experience Analyst position.

**B. The remaining twenty applications**

The charge identifies a single job application. (Doc. 1-1 at 1, ¶ 2). The complaint seeks to challenge twenty-one. (Doc. 1 at 12, ¶ 46). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice[,]'" and a "refusal to hire" is a

paradigmatic discrete act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (failures to hire "were discrete, one-time employment events"); *Jimenez*, 146 F.4th at 992. A charge describing one application would not lead an investigator to twenty others that the charging party never mentioned. *See Hillemann v. Univ. of Cent. Fla.*, 167 F. App'x 747, 749–50 (11th Cir. 2006) (per curiam) (failure-to-hire claims concerning positions not mentioned in the EEOC charge were procedurally barred). And by Plaintiff's own account, her applications continued through April 3, 2024—two months after she filed the charge. (Doc. 1 at 12–13, ¶¶ 46–47). Those applications could not have been within the charge, and Plaintiff neither amended it nor filed a new one. *See* 29 C.F.R. § 1601.12(b); *Duble*, 572 F. App'x at 893.

Plaintiff responds that the charge checked the "continuing action" box, referred to selection "processes" and "tests," and alleged that "all applicants" were funneled through the same screen, so that an investigation of the screen would naturally have encompassed her other applications. (Doc. 15 at 8–10). The argument is not without force, but the court is not persuaded. The charge does not say that Plaintiff applied for more than one position, and an investigator could not ascertain from an allegation about a class-wide practice that the charging party herself had been subjected to it twenty other times. *Hall v. Dolgencorp, LLC*, No. 2:20-cv-12, 2020 WL 7388649 (N.D. Ala. Dec. 16, 2020), on which Plaintiff relies, involved a

single employee's repeated request for the same pregnancy-related accommodation, denied in the same manner by the same employer; it did not involve applications for different positions with different requirements and different screening criteria. Plaintiff does not invoke the continuing-violation doctrine (Doc. 15 at 10), which *Morgan* in any event forecloses for discrete acts. 536 U.S. at 113–14.

Accordingly, all claims premised on applications other than the Customer Experience Analyst application are due to be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies. Plaintiff's allegations concerning those applications are not thereby rendered irrelevant; unexhausted acts may be used "as background evidence in support of a timely claim." *Id.* at 113.

**II. Count II: Disparate Treatment Under Title VII**

A plaintiff alleging intentional discrimination need not plead a prima facie case under *McDonnell Douglas*, which "is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002), *abrogated on other grounds by Twombly*, 550 U.S. 544. She must, however, "provide enough factual matter (taken as true) to suggest intentional race discrimination." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015) (per curiam) (quoting *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008)). Defendants' motion frames the question largely in terms of missing prima facie elements and comparators (Doc. 10 at 13–17), and several of the decisions on which

it relies were rendered on summary judgment or after trial. *See, e.g.*, *Underwood v. Perry Cnty. Comm'n*, 431 F.3d 788 (11th Cir. 2005) (per curiam) (reviewing grant of summary judgment); *Schoenfeld v. Babbitt*, 168 F.3d 1257 (11th Cir. 1999) (same). Plaintiff is right that those decisions do not set the pleading standard. (Doc. 15 at 11–12). But the complaint fails under the correct standard, because it alleges no fact from which the court can reasonably infer that Defendants declined to advance Plaintiff's application *because of* her race.

Intentional discrimination presupposes a decisionmaker who is aware of the protected characteristic; an employer cannot act because of a trait of which it has no knowledge. *See Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1305–06 (11th Cir. 2002). The complaint does not allege that anyone at Assurant knew Plaintiff's race when her application was screened. To the contrary, it acknowledges Defendants' "assertion that they lacked knowledge of Plaintiff's race and age at the time of screening" and responds only that such knowledge is "legally irrelevant to the disparate impact analysis." (Doc. 1 at 12, ¶ 45). That may be so, but it is not irrelevant to the disparate-treatment analysis. Nor does the complaint allege who was selected for the position, any statement or conduct by a decisionmaker suggesting racial animus, or any fact about how similarly situated applicants outside Plaintiff's protected class were treated.

The complaint's remaining allegations do not fill the gap. Paragraph 60 recites that Plaintiff is African-American, was qualified, applied, and was rejected, and that "the circumstances of her repeated rejection permit an inference of racial discrimination." (Doc. 1 at 16, ¶ 60). That is a "formulaic recitation of the elements," *Twombly*, 550 U.S. at 555, not a factual allegation. Paragraph 63 alleges that automated screening systems "can be designed or operated to intentionally discriminate" through proxy criteria—a phenomenon the complaint calls "masking." (Doc. 1 at 16–17, ¶ 63). But the complaint does not allege that Defendants did so; it alleges only that such a thing is possible, which "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Paragraph 64 alleges that Defendants' "continued operation of a keyword screening system that produces racially disparate outcomes—after being placed on notice" by the charge and by academic literature—"demonstrates at least constructive knowledge of the discriminatory effect, which is probative of discriminatory intent." (Doc. 1 at 17, ¶ 64). That theory conflates the two forms of liability Title VII recognizes. Disparate treatment requires that the employer act because of a protected characteristic; awareness that a neutral practice may have a disproportionate effect describes, at most, a decision made "in spite of" that effect, which is the province of disparate-impact liability. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see Ricci v. DeStefano*, 557 U.S. 557, 577

(2009) (contrasting intentional discrimination with "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities").

Finally, Plaintiff's twenty-one rejections do not support an inference of intent. Setting aside that twenty of them are unexhausted, they are Plaintiff's own outcomes; with no allegation about how other applicants fared, they cannot distinguish discrimination from the "obvious alternative explanation," *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567), that Plaintiff's résumé did not contain the terms for which the Talent Acquisition Manager searched—an explanation the complaint itself supplies. (*See* Doc. 1 at 14, ¶ 50 ("If Plaintiff's resume did not contain the specific terms the Manager selected, it was excluded regardless of whether her actual experience was equivalent or superior.")). The retracted interview invitation for the Product Compliance Analyst position, which the complaint characterizes as "probative of the arbitrary and opaque nature of Defendants' screening process," *id.* at 13, ¶ 47, likewise says nothing about race.

Count II is therefore due to be **DISMISSED**. Because the deficiency is one of factual content rather than legal impossibility, the dismissal is **WITHOUT PREJUDICE**.

### III. Count III: The ADEA

Count III pleads two theories. Paragraph 68 alleges that Defendants refused to hire Plaintiff "because of her age" and that her "age was the but-for cause of

Defendants' adverse employment decisions." (Doc. 1 at 17, ¶ 68). Paragraphs 69 through 73 allege that Defendants' keyword-based screening "is particularly prone to producing age-correlated disparate impact" and that Defendants failed to adopt available alternatives. *Id.* at 17–18, ¶¶ 69–73. The court addresses the theories separately.

**A. Disparate impact**

The ADEA's disparate-impact provision, 29 U.S.C. § 623(a)(2), does not extend to outside applicants for employment. *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 961 (11th Cir. 2016) (en banc) ("[T]he whole text of the Act makes clear that an applicant for employment cannot sue an employer for disparate impact because the applicant has no 'status as an employee.'"). Plaintiff acknowledges that *Villarreal* controls and preserves the issue for further review. (Doc. 15 at 15). To the extent Count III asserts a disparate-impact theory, it will be **DISMISSED WITH PREJUDICE**, because amendment would be futile.

**B. Disparate treatment**

An applicant may sue under 29 U.S.C. § 623(a)(1) when an employer refuses to hire her because of her age, *Villarreal*, 839 F.3d at 961, and to prevail she must ultimately prove that age was the but-for cause of the decision, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 180 (2009). At the pleading stage, Plaintiff must allege facts that make that causal claim plausible. She has not.

The only allegation of age-based intent is the conclusion in paragraph 68. The following paragraphs describe a mechanism by which a neutral screen could correlate with age: résumé terminology and job-title conventions "evolve over time"; a manager who selects search terms "without auditing their age-correlated effect will systematically favor" résumés using current terminology; and "[e]mployment dates embedded in resumes further permit age inference even when birth date is not collected." (Doc. 1 at 17–18, ¶¶ 69–70). Those are allegations of disparate impact, and the complaint itself acknowledges that Defendants "do not ask applicants to provide any information regarding their age or date of birth during the application process." *Id.* at 18, ¶ 71. Nothing in the complaint suggests that anyone at Assurant inferred Plaintiff's age from her résumé, much less declined to advance her application for that reason. Plaintiff is correct that the selection of another candidate over forty would not by itself defeat an ADEA claim, *see O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996), but the point does not assist her, because the complaint alleges nothing about who was selected, and the court does not rely on Assurant's position statement for that fact.

To the extent Count III asserts a disparate-treatment theory, it will be **DISMISSED WITHOUT PREJUDICE**.

## IV. Count I: Disparate Impact Under Title VII

Title VII proscribes employment practices that are "fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). A disparate-impact violation is established when a complaining party "demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race . . . and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity[.]" 42 U.S.C. § 2000e-2(k)(1)(A)(i). The complaining party ordinarily must "demonstrate that each particular challenged employment practice causes a disparate impact . . . ." *Id.* § 2000e-2(k)(1)(B)(i). At the pleading stage, then, a complaint must plausibly allege (1) a specific employment practice and (2) facts suggesting that the practice causes a disparate impact on the protected group.

### A. The complaint identifies a specific employment practice.

The complaint isolates a particular practice: the use of employer-selected "key skills/terms," applied to the applicant pool for the Customer Experience Analyst position through the Workday platform, as the gateway that determines which applications receive any further review. (Doc. 1 at 6–7, ¶¶ 22–23; *id.* at 14, ¶¶ 52–53). That is a defined selection device applied across "hundreds of applications." *Id.* at 6, ¶ 22. It is not a generalized complaint that hiring is subjective, and it is readily distinguishable from the undefined "hazy" selection process found insufficient in

*Stewart v. Bd. of Trs. For Univ. of Ala. Sys.*, No. 2:22-cv-203, 2022 WL 3205021, at *3 (N.D. Ala. Aug. 8, 2022), which Defendants rely on.

Defendants respond that a manager's choice of search terms is an "individualized decision," not "the type of facially neutral policy or practice that can support a disparate impact theory." (Doc. 10 at 18; *see* Doc. 18 at 8). The Supreme Court has rejected that categorical position. "[D]isparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests," and "subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990–91 (1988). Whether the manager personally read applications, ran searches through the platform, or did both is a question about how the practice operated, not whether one has been identified. Defendants' characterization of the process as an ad hoc exercise of individual judgment is, moreover, drawn from Assurant's position statement rather than from the complaint, which alleges the opposite. (Doc. 1 at 8, ¶ 29).

### B. The complaint does not plausibly allege that the practice causes a disparate impact.

The complaint fails on the second element. Plaintiff need not plead a complete statistical case, and the court agrees that "[i]t is unreasonable and contrary to pleading standards to expect [a plaintiff] to be able to allege statistical data in her complaint" concerning an employer's internal applicant pool. *Hall*, 2020 WL

7388649, at *5. But Rule 8 still requires factual content that makes it plausible—not merely possible—that the identified practice disproportionately excludes members of the protected class. *See Pouyeh v. Bascom Palmer Eye Inst.*, 613 F. App'x 802, 810–11 (11th Cir. 2015) (per curiam) (affirming dismissal of disparate-impact claim unsupported by any factual allegation of a disparity). The complaint contains none.

The complaint never identifies a single term for which Assurant's Talent Acquisition Manager searched. It therefore cannot, and does not, allege any fact from which a correlation between the search terms and race could be inferred. The assertion that Assurant's criteria were "calibrated to terminology more commonly appearing in the resumes of white applicants," (doc. 1 at 15, ¶ 54), is a conclusion untethered to any pleaded term, credential, or job title. The complaint alleges nothing about the racial composition of the applicant pool for the Customer Experience Analyst position or about the rate at which African-American applicants, compared with others, passed through the screen.

The academic literature that the complaint relies on does not supply the missing link. That literature concerns machine-learning models that inherit bias from the historical data on which they are trained—models that exhibit "hindsight bias" by presuming "that the characteristics associated with past hires led to their success," that discover proxies through "redundant encodings," and that result from "training a model on data from an existing workforce." *Id.* at 2–3, ¶¶ 6–7; *id.* at 8, ¶¶ 30–31;

*id.* at 10–12, ¶¶ 36, 40, 42–44. The practice the complaint pleads, however, is a human manager's selection of search terms. *Id.* at 6, ¶ 22; *id.* at 9–10, ¶ 35. There is no training data and no model. The literature thus describes a mechanism different from the one alleged, and it cannot make plausible a disparity that it does not address.

What remains is Plaintiff's own experience: twenty-one applications, none advanced. *Id.* at 12–13, ¶¶ 46–48. Twenty of those applications are unexhausted, and even considered as background, the outcomes of a single applicant cannot show that a practice disproportionately excludes a group. *See Pouyeh*, 613 F. App'x at 811. Nor can they distinguish a discriminatory screen from one that simply searched for terms that Plaintiff's résumé did not contain. (*See* Doc. 1 at 14, ¶ 50).

Plaintiff's response is that the pass-through data are in Defendants' possession and that discovery will supply the proof. (Doc. 15 at 17). The court is mindful of the informational asymmetry. But Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," *Iqbal*, 556 U.S. at 678–79, and the informational disadvantage Plaintiff identifies does not excuse the more basic failure to plead any fact connecting the identified practice to a racial disparity. Because the complaint identifies a practice but pleads no facts making it plausible that the practice produces a disparate impact on the basis of race, Count I is due to be **DISMISSED WITHOUT PREJUDICE**.

**V. Leave to Amend**

Plaintiff requests, in the alternative, twenty-one days to amend. (Doc. 15 at 18–19). The request appears only in her response brief and is unaccompanied by a proposed amended complaint or any description of what an amendment would allege. "Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009) (quoting *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999)). A proper motion for leave to amend "should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999); *see also Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018); *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018). And "[a] district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc). *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001), on which Plaintiff relies, applied a rule that the en banc court has since confined to pro se litigants. *See Wagner*, 314 F.3d at 542 & n.1. Plaintiff also allowed the period for amending as of right to expire without acting. *See* Fed. R. Civ. P. 15(a)(1)(B).

Even so, leave to amend should be "freely" given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). This is Plaintiff's first pleading, the case is at its outset, no scheduling order has been entered, and—except for the ADEA disparate-impact theory—the deficiencies identified above concern the absence of factual content rather than a legal bar. The court will therefore afford Plaintiff an opportunity to seek leave to amend in the manner the Eleventh Circuit requires. Any such motion must attach a proposed amended complaint that is limited to the Customer Experience Analyst application, omits the ADEA disparate-impact theory, and pleads facts—consistent with counsel's obligations under Rule 11—sufficient to cure the deficiencies identified in this opinion.

## CONCLUSION

For the reasons stated, Defendants' motion to dismiss, (doc. 10), is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The motion is **DENIED** insofar as it contends that Plaintiff failed to exhaust administrative remedies with respect to the keyword-screening theory as applied to the Customer Experience Analyst position.
2. All claims premised on applications other than the Customer Experience Analyst application are **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies.
3. Count III is **DISMISSED WITH PREJUDICE** to the extent it asserts a disparate-impact theory under 29 U.S.C. § 623(a)(2).
4. Count I, Count II, and the disparate-treatment theory of Count III are **DISMISSED WITHOUT PREJUDICE** for failure to state a claim.

Plaintiff may, on or before **October 22, 2026**, file a motion for leave to amend that attaches a proposed amended complaint consistent with this Memorandum Opinion and Order. If Plaintiff does not timely file such a motion, the court will enter final judgment without further notice.

**DONE** and **ORDERED** on October 1, 2026.

**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE